# Hatfield v. Hatfield.

(Decided Dec. 6, 1932.)

HARMAN, FRANCIS & HOBSON for appellant.

J. J. MOORE and W. SCOTT WHITT for appellee.

OPINION OF THE COURT BY JUDGE CLAY—Affirming.

John W. Hatfield, a well to do farmer of Pike county, had eight sons, three daughters, and a granddaughter. In the month of April, 1922, he decided to divide his lands among his sons, and provide for the payment to his daughters and granddaughter of the sum of $500 each. The division lines were agreed on between him and his sons, and he and his first wife, Nancy, signed and acknowledged the deeds for the purpose of carrying the division into effect. Each of the sons was required to pay to the daughters and granddaughter the sum of $250. Basil, the youngest son, was conveyed the home place on which John W. Hatfield and Nancy, his first wife, then lived. After the execution of the deeds, the majority of the sons moved onto and took possession of the tracts which had been conveyed to them. A few months after the execution of the deeds, Nancy, the mother of the family, died, and Basil and his wife moved into the house occupied by his father. After living there for a few months, his father announced his purpose to marry again, and Basil erected himself a small home on another part of the tract a few days before the marriage, which took place in November, 1922, or about a year and six months after the execution of the deeds. Each of the deeds provided that the parties of the first part should have possession and control of the lands during their lifetime. The father did not interfere with the boys in their use and enjoyment of the lands conveyed to them. On the 5th of December, 1925, Basil, at the insistence of his father, entered into a contract with the latter by which he agreed to let his father and stepmother have peaceable possession of the mansion house, and about three acres of land, during the natural lifetime of his

father. The material portion of the contract is as follows:

"Witnesseth: That for and in consideration of the sum of One Dollar, cash in hand paid, the receipt of which is hereby acknowledged, the party of the first part for part of a consideration of a certain deed made and executed by the party of the second part, together with Nancy Hatfield, his wife, dated the 21st day of April, 1922, to the said party of the first part and which deed is not yet of record. The party of the first agrees that he will let Nancy Jane Hatfield and J. W. Hatfield have peaceful possession of that certain part of real estate herein set forth which was deeded to the said Basil Hatfield by J. W. Hatfield and others on the 21st day of April, 1922, for the period during the natural lifetime of the said J. W. Hatfield, and will permit them to live on said premises undisturbed. The description follows. * * *"

On December 8, 1925, the deeds, including the one to Basil, were put to record. The father died in the year 1929.

This suit was brought by Basil against his stepmother, Nancy Jane, to recover possession of the three-acre tract of land on which she and her husband had been living, and which she continued to occupy after his death. His stepmother defended on the ground that the deed to Basil was not delivered until after her marriage with his father, and on the further ground that Basil had entered into a contract with his father by which his father and she were to have the possession of the property during their lifetime. She further averred that the contract set out in the petition was not the correct agreement between the father and Basil. The allegations of the answer and counterclaim were denied by reply. The cause was then transferred to equity, and depositions taken. On final hearing the chancellor adjudged that Nancy Jane Hatfield was entitled to occupy the mansion house and surrounding land in controversy until dower was assigned, and dismissed the petition. Basil appeals.

In view of the conclusions of the court, it will not be necessary to consider the legal effect of the contract of December 5, 1925, set out above, or to determine whether it is the contract actually entered into between

the parties. The decisive question is, Was the deed to Basil delivered before his father's marriage to Nancy Jane Hatfield? If not, the title was still in the father, and she was entitled to her dower rights in the property. The evidence bearing on the delivery of the deeds, to which no written exceptions were filed, may be summarized as follows: According to Basil, his father told him and his brothers that he was going to make out the deeds. They assembled at their father's home and marked out the lines. David Blankenship, a notary public, was sent for to write the deeds. He, Melvin, and Landon were there, and perhaps one or two others. When Squire Blankenship got through writing the deeds, they were signed and acknowledged, and his father gave him his deed, and Melvin his. He also gave Melvin the rest of the deeds to deliver to those who were not there. After he got his deed, he took it home and put it in the trunk. The reason his deed was not put to record until December 8, 1925, was that they each had to pay the girls a certain amount of money, and they did not put them to record until they all got in shape to pay the girls. After his father married, he entered into the contract of December 5, 1925. After he signed the contract, he left it with the bank for his father. Melvin Hatfield, who was also present, testified that, after the deeds were written by Squire Blankenship and signed and acknowledged, they were turned over to the boys who were there, some three or four of them. The other deeds were turned over to him, and his father told him to distribute them out and he did so. Andy Akers, who lived on the farm and witnessed the deeds, testified that, after the deeds were written, John W. Hatfield read them over and he signed them. All that he remembered being there were the father and two sons, Basil and Melvin, and the father gave the sons their deeds. Old man Hatfield himself reached Basil his deed. John Phillips, who knew, and was practically raised by, John W. Hatfield, saw Basil's deed at Basil's home before John W. Hatfield married Nancy Jane. Jesse Phillips, a son of John Phillips, saw the deed the spring after Basil's mother died. At that time Basil was staying at the home place and went and got the deed and brought it out on the front porch. He did not know where Basil found it, but Basil went into his own room to get the deed. Sherman Hatfield, a son of John Hatfield, saw his father's deed and Allen's and Nicholas' deeds before his grandfather married the

second time. John B. Hatfield, a son of John W. Hatfield, testified, that he was present when Dave Blankenship wrote the deed, and his deed was delivered. He also saw his father deliver Basil's deed to him, and Basil left there with the deed. His father said that they could do as they pleased, but if he were in their place he would hold out until they had, settled with the girls. D. H. Blankenship, justice of the peace, and a practicing attorney, testified that he took acknowledgments to eight deeds executed by Mr. Hatfield to his boys. There were two or three of the boys present, and maybe more. In his judgment he passed the deeds over to Mr. Hatfield, and after that some of the boys took the deeds and distributed them out after they were acknowledged. According to his best recollection, some of the boys had the deeds there and took them in charge. Basil was there and was the person that pointed out some of the boundary lines, or helped point them out. He could not say whether he left before the crowd left or not. According to his best recollection, some of the boys were there when he left. He did not know what the boys did with the deeds. He did not remember of their passing the deeds back to Mr. Hatfield.

On the other hand, Nancy Jane Hatfield testified that her husband said that he laid a boundary off for her and made Basil sign it over to her before he delivered the deed to him. Mary Hatfield, a daughter of John W. Hatfield, remembered when a man came to the house to write some deeds. She was then about 16, and her mother was living. After the deeds were executed, they were put in her mother's trunk. After her mother's death, her father called her and told her that he wanted to read the deeds and take them to the bank for fear they would be destroyed. She went to the trunk and got the deeds out. She found the deeds to Basil, Melvin, Landon, and others. This was a short time after her mother's death. She gave the deeds to her father, and he left home with them in his pocket, saying that he was going to take them to the bank. One time Basil told her that he had made a deed over to his stepmother for her life-time, but he wished a thousand times he had not. He said he had to before his father would let the deed go to record. Mrs. Melda Ball, another daughter of John W. Hatfield, testified that her father had the deeds in her mother's trunk,

and she saw them. Her father first said that he was going to keep them and not deliver them in his lifetime, but later on said it would knock the boys out of some timber if they did not put the deeds on record. He decided to deliver them for that purpose, but was sorry he did. That was after he was married the second time, and not so long before he died. Her father took the deeds out of her mother's trunk after she died, and said he put them in the bank. She thought it was in 1925, when he said he delivered them to the boys. On one occasion she heard her father say to her stepmother, "You know I fixed it for you, and I want you to stay on it your lifetime." He had reference to the home place. He also said there was a writing fixing it. Toots Chapman went to work for John W. Hatfield and his second wife when she was about 13 years of age. About two years before his death it seemed to her she saw him deliver the deeds. She heard Basil and him talking, and he asked Basil to sign Nancy Jane over a life estate to the home place. He told Basil he would never deliver the deed until he signed over. Basil and he had a dispute about it, but Basil agreed to it. Basil left. She thought he was at Matewan when the deeds were delivered, but she did not go with him. She never remembered of the deeds being in the trunk.

It will be observed that Basil, Melvin, and John B. Hatfield, three of the sons of the grantor, John W. Hatfield, testified that, on the occasion when the deeds were executed and acknowledged, they were actually delivered, and that Squire Blankenship, who wrote the deeds, stated that, according to his best recollection, some of the boys had the deeds there and took them in charge, but he admits that some of the boys were there when he left, and of course he could not tell whether the deeds, after they had been examined by the boys, were returned to the father or not. Therefore, for aught that he testified to, the father may have retained possession of the deeds. On the other hand, there is positive evidence by two of the daughters that all the deeds remained in their mother's trunk, and were seen there after the second marriage. It may be that the witnesses, who so testified, saw Basil's deed in his possession, but, as he may have had access to his mother's trunk, that fact is not so persuasive of the delivery of the deed. In addition to this, Toots Chapman, a disinterested witness, claims to have heard a dispute be-

tween Basil and his father in which the father stated that he would not deliver the deed until he signed an agreement giving Nancy Jane a life estate in the home place. There is further evidence by one of the daughters that her father took the deeds out of her mother's trunk after she died, and said that he put them in the bank. But perhaps of more persuasive effect than any of the evidence in the case is the fact that the contract between Basil and his father recited that his deed had not been put to record, and that three days after the execution of that contract all the deeds were filed of record. Taking the view most favorable to appellant, it cannot be said with reasonable certainty that the chancellor erred in his finding of fact. On the contrary, the most that can be said is that the evidence is such as to raise a doubt as to the chancellor's finding, and in such case his finding will not be disturbed on appeal. Combs v. Casebolt, 233 Ky. 192, 25 S. W. (2d) 365.

Judgment affirmed.